J-A04013-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: RELINQUISHMENT OF: | : | IN THE SUPERIOR COURT OF |
| B.M.A., A MINOR | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.A., FATHER | : | No. 1310 MDA 2017 |

Appeal from the Decree August 3, 2017
In the Court of Common Pleas of Lackawanna County
Civil Division at No: A-32-2017

BEFORE: STABILE, J., NICHOLS, J., and RANSOM*, J.

MEMORANDUM BY STABILE, J.: **FILED SEPTEMBER 18, 2018**

J.A. ("Father") appeals from the decree entered August 3, 2017, in the Court of Common Pleas of Lackawanna County, which terminated involuntarily his parental rights to his minor son, B.M.A. ("Child"), born in January 2014.[1] After careful review, we affirm.

We summarize the relevant factual and procedural history of this matter as follows. The Lackawanna County Office of Youth and Family Services ("the Agency") became involved with Child in May 2014 due to an incident during which police officers pulled over Father and Mother and discovered that they

_____

* Retired Senior Judge assigned to the Superior Court.

[1] Child's mother, H.R. ("Mother"), executed a consent to adoption form on March 6, 2017. The trial court confirmed Mother's consent and terminated her parental rights on the same day that it terminated Father's parental rights. Mother did not file a notice of appeal, nor did she file a brief in connection with this appeal.

were driving while using drugs with Child in their vehicle.[2] Father was released from incarceration shortly after this incident and tested positive for "spice."[3] The juvenile court adjudicated Child dependent and placed him in foster care. The court returned Child to the custody of his parents in October 2014 and terminated court supervision in February 2015.

The Agency became involved with Child for a second time less than a year later, after Father was incarcerated for a parole violation in January 2016. Father violated his parole by having a computer in his home. Notably, Father is a registered sex offender who spent approximately nine years in prison for possession of child pornography. Father left Child with his roommate, who later informed the Agency that he was unable to serve as a caregiver.[4] The Agency obtained emergency custody on March 1, 2016, and the juvenile court adjudicated Child dependent on March 29, 2016. Father was released in July 2017.

---

[2] Father was charged with endangering the welfare of children as a result of this incident. According to Father's counsel, the charge was later dismissed. N.T., 8/1/17, at 39.

[3] "Spice" is a term referring to synthetic marijuana.

[4] Father testified that Mother was unavailable to care for Child at that time because "she was on probation and she kept failing on her probation, she kept going back to jail, rehab, halfway houses, so she was fairly non-existent." N.T., 8/1/17, at 73-74.

On June 8, 2017, the Agency filed a petition to terminate Father's parental rights to Child involuntarily. The trial court conducted a termination hearing on August 1, 2017.[5] Following the hearing, on August 4, 2017, the court entered a decree terminating Father's parental rights. Father timely filed a notice of appeal on August 21, 2017, along with a concise statement errors complained of on appeal.

Father now raises the following issues for our review.

A. Whether the trial court erred as a matter of law and/or manifestly abused its discretion in determining the Agency sustained its burden of proving the termination of Father's parental rights is warranted under Section 2511(a)(2)[,] (a)(5)[,] or (a)(8) of the Adoption Act?

B. Even if this Court concludes the Agency established statutory grounds for the termination of Father's parental rights, whether the trial court nevertheless erred as a matter of law and/or manifestly abused its discretion in determining the Agency sustained its additional burden of proving the termination of Father's parental rights is in the best interests of the child?

Father's Brief at 5 (unnecessary capitalization and suggested answers omitted).

We review Father's issues mindful of the following standard of review.

---

[5] The trial court appointed a guardian *ad litem* ("GAL") to represent Child. Due to Child's age of only three and a half years, it is apparent that he was unable to express his preferred outcome in this case. Thus, the court's appointment of a GAL satisfied Child's right to counsel pursuant to 23 Pa.C.S.A. § 2313(a). *See In re T.S.*, ___ A.3d ___, 2018 WL 4001825 at *10 (Pa. 2018) (holding, in the case of children who were two and three years old, that an attorney-GAL representing the best interests of the children satisfied their right to counsel pursuant to Section 2313(a)).

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Father's parental rights pursuant to Section 2511(a)(2), (5), (8), (11), and (b).[6]  We need only agree with the court as to any one subsection of Section 2511(a) as well as Section 2511(b) in order to affirm.  *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004).  Here, we analyze the court's decision to terminate pursuant to Section 2511(a)(2) and (b), which provides as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein

---

[6] We observe that the Agency filed its petition for involuntary termination of Father's parental rights pursuant to Section 2511(a)(2), (5), (8), and (b) only, and did not request termination pursuant to Section 2511(a)(11).

which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We begin by considering whether the trial court abused its discretion pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted). "[A] parent's incarceration is relevant to the [S]ection [2511](a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the 'essential parental care, control or subsistence' that the section contemplates." *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014) (discussing *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012)).

In the instant case, the trial court found that Child has spent a total of twenty-four months in foster care since his birth in January 2014, due to Father's drug use and incarcerations. Trial Court Opinion, 9/18/17, at 5. The

court further found that Father will be a registered sex offender for the next twenty-three months, and will be on parole for the next twenty-nine months. *Id.* The court expressed concern that Father's sex offender status prevents him from having contact with children, and that he has violated his parole on multiple occasions in the past. *Id.* at 5-6. The court also expressed concern that Father has a history of mental health issues, and that he achieved only minimal compliance with his permanency plan. *Id.* at 6.

Father acknowledges that his recent incarceration prevented him from parenting Child, but emphasizes that he was released two weeks before the termination hearing. Father's Brief at 27-28. Father also acknowledges that he is a registered sex offender, but contends that this by itself should not preclude reunification. *Id.* at 28. Father points out that the Agency reunified him with Child in 2014 despite being a sex offender and on parole. *Id.* at 28-29. Father challenges the trial court's findings that his status as a sex offender prohibits him from being around children and that he violated his parole on multiple occasions. *Id.* at 28-30. Father concedes that he has certain parole restrictions, which prevent him from immediate reunification with Child, but insists that he is working quickly in order to have those restrictions lifted. *Id.* at 30.

After careful review, we conclude that Father is not entitled to relief. The record reveals that Father has a history of criminal activity and drug use. Father testified that he was incarcerated from 2000 to 2009 for possession of child pornography. N.T., 8/1/17, at 109-10. Because of his status as a sex

offender, Father is subject to a registration requirement of ten years, with twenty-three months of that requirement remaining at the time of the hearing. *Id.* at 100.  Agency caseworker, Danielle Beahan, testified that she reviewed records of Father's parole following his release, which indicated that his "overall supervision was very poor. . . . due to his inability to use discretion with daily decision making skills." *Id.* at 19-20.  She noted that Father has violated his parole on multiple occasions.  *Id.* at 17.   Father's violations included having a relationship with a woman with a minor child and failing to register his Facebook page.  *Id.* at 17-18.   This latter violation resulted in Father facing a criminal charge for unsworn falsification to authorities.[7]  *Id.* at 18.

In addition, as discussed above, Father was incarcerated briefly in May 2014 after an incident during which the police pulled him and Mother over and discovered that they were "smoking drugs" while driving with Child in their vehicle. *Id.* at 13.  After his release from incarceration, Father tested positive for "spice." *Id.*  Father's actions resulted in Child spending several months in foster care, until October 2014.  *Id.* at 13-14.  In December 2015, Father suffered what he testified was an accidental overdose of his prescription medications, including "my heart and psych medicine." *Id.* at 98.  Notably, Ms. Beahan testified that Father filled a prescription for "Oxycodeine" about a

---

[7] Father testified that he created the Facebook page in 2009 but was not arrested until 2015.  N.T. 8/1/17, at 126.  Ms. Beahan explained that Father was sentenced on this charge in July 2016.  *Id.* at 58.

week earlier, and that police officers discovered only one pill left in the bottle at the time of the overdose. *Id.* at 25-26. Father claimed that a "guy who's an addict that came to my house" stole the remainder of his pills, but the trial court rejected this explanation, stating, "I don't necessarily believe that to be true." *Id.* at 118, 148.

These events culminated in Father's January 2016 incarceration for a parole violation. Father violated his parole by having a computer in his home. *Id.* 15, 18. Father then spent the next year and a half in prison while Child waited in foster care. *Id.* at 15-16. While Father was released in July 2017, he remained in no position to resume caring for Child. Father testified that he was residing in a halfway house and that he was looking for work. *Id.* at 70, 105. He estimated that it would be at least another two or three months until he found a place to live. *Id.* at 70, 132. Father added that he would be on parole for seventeen months, followed by twelve months of special probation. *Id.* at 70. Complicating matters further, Ms. Beahan testified that Father's parole officer was prohibiting him from having contact with Child. *Id.* at 29. She explained, "Once [Father] was released, the parole officer did stop all contact, whether it was phone or in-person visits until after [Father] obtains a polygraph."[8] *Id.*

---

[8] Father testified that his parole officer "only told me he wanted me to have a sex offender evaluation done," and that he is awaiting the officer's referral in order to schedule the evaluation. N.T., 8/1/17, at 106. Father explained that his parole officer imposed this restriction because "he says that's [*sic*] the rules that I signed when I left prison he says, but it's up to their discretion." *Id.* at 130.

Accordingly, it is clear that Father is incapable of caring for Child and that he cannot or will not remedy his parental incapacity. Father's history of criminal activity and drug use raises serious concerns regarding his ability to provide Child with an appropriate home. Father's status as a sex offender is particularly troubling. It remains doubtful that Father will be able to obtain employment, find housing, and demonstrate the safety and stability necessary to achieve reunification at any point in the foreseeable future. In addition, it remains doubtful that Father will be able to refrain from further criminal activity and drug use, and comply with the requirements of his parole. At the time of the hearing, Child had spent already twenty-three months of his forty-three months of life in foster care. Child cannot wait forever. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). Therefore, we affirm the portion of the trial court's decree terminating Father's parental rights as to Section 2511(a)(2).

Next, we consider whether the trial court abused its discretion pursuant to Section 2511(b). The requisite analysis is as follows.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law,

- 10 -

however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the [S]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

The trial court addressed Section 2511(b) only briefly at the conclusion of its opinion. The court reasoned, "While Ms. Beahan testified that the visits that [Father] had with [] Child went well, this Court finds that the Agency provided sufficient evidence to satisfy the grounds for termination of [Father's] parental rights, and it is in the best interests of [] Child." Trial Court Opinion, 9/18/17, at 6.

In response, Father contends that he and Child share a bond, and that the trial court failed to consider the nature of that bond and the effect that severing it would have on Child. Father's Brief at 32-33. He asserts that the court conducted an improper Section 2511(b) analysis by focusing instead on his status as a sex offender and incarceration. *Id.* at 33. He further asserts

- 11 -

that the court should have placed greater emphasis on his efforts to maintain contact with Child during his incarceration. *Id.*

We conclude once again that Father is not entitled to relief. As Father argues, it was undisputed during the termination hearing that he and Child share a bond. Ms. Beahan testified that Father participated in sixteen visits with Child during his incarceration, which were each approximately one-hour in length. N.T., 8/1/17, at 41-42. She recalled that the visits went well and that Father did not require redirection. *Id.* at 29-30. When asked whether she observed a bond between Father and Child, she explained, "I haven't supervised enough visits to make a statement on that. I do know that the visits that I did see there was a bond, they played well together. [Child] was excited to see him." *Id.* at 30.

Furthermore, the trial court heard the testimony of family development specialist, Kathleen Kutsop, who provided parenting instruction to Father pursuant to an Agency referral from July 2014 until December 2015. *Id.* at 138, 141. She agreed that Child appeared to enjoy spending time with Father, and that she observed a bond. *Id.* at 140. She stated, "that's something that I stressed very firmly from the very beginning how to have that secure attachment between parent and child." *Id.*

Despite this evidence, the record supports the trial court's conclusion that terminating Father's parental rights would best serve Child's needs and welfare. As discussed above, Father is incapable of providing Child with a safe

and stable home, and he will not be able to remedy that incapacity at any point in the foreseeable future. **See C.D.R.**, 111 A.3d at 1220 ("Clearly, it would not be in Child's best interest for his life to remain on hold indefinitely in hopes that Mother will one day be able to act as his parent."). Additionally, Ms. Beahan testified that Child has a strong bond with his pre-adoptive foster mother. **Id.** at 35. She explained, "[Child] is very bonded with [his foster mother, K.J.] He feels very comfortable in the home, he's very bonded with [K.J.'s] family. [K.J.] has an older daughter, who is also a minor, she's older than [Child], they have a great relationship together." **Id.**

We agree with Father that the trial court should have included a more thorough analysis of Section 2511(b) in its opinion. It is well settled that a court considering a termination petition must pay the utmost attention to the effect of severing a child's relationship with his or her parent. **T.S.M.**, 71 A.3d at 267. A mere conclusory assessment of a child's needs and welfare is not enough. **See In re Adoption of A.C.H.**, 803 A.2d 224, 229-30 (Pa. Super. 2002) (reversing where the record lacked sufficient evidence addressing the bond between A.C.H. and his mother, and where the trial court addressed A.C.H.'s needs and welfare in only a "conclusory fashion"). Nevertheless, under the circumstances presented here, we conclude that the trial court's analysis was sufficient to avoid reversal of the termination decree. Our review of the record reveals that the court was well aware of Father's positive visits with Child when reaching its termination decision. The court acknowledged

the quality of these visits during the hearing. ***See*** N.T., 8/1/17, at 87 ("I mean, no one is denying that the visits went well in prison"). However, it is apparent that the court did not believe that Father's positive visits, which amounted to approximately sixteen hours with Child over the span of a year and a half, were sufficient to overcome his ongoing parental incapacity and Child's lack of permanence and stability. Because the record supports this conclusion, we discern no abuse of discretion.

Based on the foregoing, we conclude that the trial court did not abuse its discretion by terminating Father's parental rights to Child. Therefore, we affirm the court's August 4, 2017 decree.

Decree affirmed.

Judge Nichols concurs in the result.

Judge Ransom did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 09/18/2018